IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 26, 2019

## STATE OF TENNESSEE v. MARTHA ANN MCCLANCY

**Appeal from the Criminal Court for Monroe County**
**No. 13-307     Andrew M. Freiberg, Judge**

_____

### No. E2018-00295-CCA-R3-CD

_____

The defendant, Martha Ann McClancy, appeals her Monroe County Criminal Court jury convictions of attempted first degree murder and conspiracy to commit first degree murder, arguing that the trial court erred by denying her motion to suppress photographs of the scene taken by her co-conspirator Charles Kaczmarczyk, her motion in limine to exclude evidence of acts committed following the death of the victim, and her motion for a mistrial; that the trial court erred by admitting photographs of the victim taken during the autopsy; that the trial court's making negative comments to and about her in front of the jury deprived her of the right to a fair trial; that the evidence was insufficient to support her convictions; and that the trial court erred by imposing consecutive sentences. The State concedes, and we agree, that the trial court erred by imposing consecutive sentences in this case. Instead, because Code section 39-12-106 prohibits the imposition of dual convictions for two inchoate offenses designed to achieve the same objective, the trial court should have merged the defendant's convictions. Thus, we affirm the jury verdicts, reverse the imposition of consecutive sentences, and remand the case for the entry of corrected judgment forms reflecting that the convictions are merged.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and D. KELLY THOMAS, JR., JJ., joined.

Matthew Rogers, Athens, Tennessee, for the appellant, Martha Ann McClancy.

Herbert H. Slatery III, Attorney General and Reporter; Katherine Redding, Assistant Attorney General; Stephen Bebb, District Attorney General; and Joseph McCoin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Monroe County Grand Jury charged the defendant with first degree premeditated murder and the defendant and Charles Kaczmarczyk with conspiracy to commit first degree murder for the May 15, 2006 death of the defendant's husband, Robert J. McClancy.

*Factual Overview*

The evidence adduced at the defendant's November 2015 trial established that Mr. Kaczmarczyk befriended the victim while the two participated in a six-week residential treatment program for veterans with post-traumatic stress disorder ("PTSD"). The two remained close after the program ended, and Mr. Kaczmarczyk began visiting the victim at the home he shared with the defendant. During this time, the defendant and Mr. Kaczmarczyk began a romantic relationship, and the defendant began discussing plans to kill the victim so that they could be together.

The defendant, who had agreed to be in charge of the victim's medication, indicated to Mr. Kaczmarczyk that she had been mixing medication into the victim's food. She asked Mr. Kaczmarczyk, who had been prescribed the same medication as the victim, to bring more medication to the residence, and she and Mr. Kaczmarczyk secreted the medication around the residence to make it appear as though the victim had been hoarding it. When the victim was hospitalized for a drug overdose, both the defendant and Mr. Kaczmarczyk told treating physicians that the victim had expressed suicidal ideations. After the victim returned home following that hospitalization, the defendant and Mr. Kaczmarczyk put into action a plan to overmedicate the victim and make it appear as though he had committed suicide.

Mr. Kaczmarczyk telephoned 9-1-1 on May 15, 2006, to report that he had discovered the victim's body. Officers responding to the call found the victim's lifeless body in his recliner, a pill bottle in one hand and a pistol in the other. The area around the victim was in disarray, and pills were strewn about. After officers discovered on a digital camera belonging to Mr. Kaczmarczyk photographs of the victim's body in a variety of poses that indicated that the scene had been staged, Mr. Kaczmarczyk was arrested and eventually charged with evidence tampering and criminally negligent homicide. The photographs were later deemed inadmissible due to the failure to obtain a warrant before searching the contents of the camera, and the charges against Mr. Kaczmarczyk were subsequently dismissed.

The defendant and Mr. Kaczmarczyk moved in together and began traveling extensively. The defendant applied for and received survivor's benefits from

the United States Department of Veteran's Affairs ("VA") and the United States Social Security Administration ("SSA"). The defendant and Mr. Kaczmarczyk eventually married and began a scheme to defraud the federal government. A federal investigation led to their arrests and subsequent guilty pleas to theft in federal court. During the pendency of the federal investigation, the defendant executed a durable power of attorney giving her son authority to conduct her affairs while she was incarcerated. She also gave her son several computers for him and his children to use. After one of the children discovered a disturbing image on one of the computers, the defendant's son examined the contents of the computers and discovered the photographs of the victim that had originally been taken by Mr. Kaczmarczyk's camera. He contacted the federal authorities, who, in turn, contacted the state authorities. He later turned the computers and some documents over to the state authorities.

Upon questioning by the Tennessee Bureau of Investigation ("TBI"), Mr. Kaczmarczyk implicated the defendant in the victim's murder and admitted that they had planned the murder together.

*Trial*

Jeffrey Colins, a former Monroe County 9-1-1 operator, testified that on May 15, 2006, he answered a call shortly after 5 p.m. from 215 Unicoi Lake Road ("the Coker Creek residence") in Monroe County. A recording of that call was played for the jury.

Monroe County Sheriff's Office ("MCSO") Patrol Officer Christopher Logan Day responded to the 9-1-1 call, and when he arrived at the Coker Creek residence, he "encountered Mr. Kaczmarczyk walking from the house up the driveway, approximately halfway between the house and the road." Officer Day patted Mr. Kaczmarczyk down and instructed him to remain outside while Officer Day and his partner conducted a sweep of the house. Upon entering the house, Officer Day observed "white pills laying around in the floor" and "a lifeless body in a recliner" holding a "pistol in his right hand" and "a pill bottle in his left[]hand." The victim had "a cut or abrasion[] on his forehead" that appeared to be recent to the time of death. The house, "particularly around the kitchen, was certainly in disarray." Officer Day observed a number of pills and documents, one of which documents he believed to be a living will, in the kitchen. Officer Day recalled that the defendant arrived "a little bit later," but he had only limited contact with her.

MCSO Detective Travis Jones also responded to the Coker Creek residence, where he took photographs and gathered information. Detective Jones identified photographs of the victim in the recliner. Detective Jones said that all the

rounds were chambered in the pistol they took from the victim's right hand. In the kitchen, pills, a pill holder, and a do not resuscitate ("DNR") order were lying on the counter. He "collected all the pills that were strung about through the house, the pill bottle in the hand and also the pistol." Detective Jones said that the defendant arrived 30 to 40 minutes after he did and provided written consent to search the residence. The defendant also gave Detective Jones "several different pieces of paperwork," including "a journal of what she kept about the events at the VA and different stuff." The journal contained a variety of odd entries written by the defendant.

Upon cross-examination by the defendant, Detective Jones testified that Mr. Kaczmarczyk was originally charged in 2006 with evidence tampering and criminally negligent homicide in relation to the victim's death. Mr. Kaczmarczyk was arrested at the scene on the day of the offense after Detective Jones viewed photographs on Mr. Kaczmarczyk's digital camera. Those photographs depicted the victim's lifeless body in a variety of staged scenes. Detective Jones acknowledged that another judge had ruled that he should not have examined a digital camera without a search warrant and had, in consequence, suppressed the photographs from the digital camera. All the charges against Mr. Kaczmarczyk were dismissed after the photographs were suppressed.

Detective Jones also acknowledged that, in an interview conducted before his May 15, 2006 arrest, Mr. Kaczmarczyk did not implicate the defendant in any foul play. Mr. Kaczmarczyk admitted to Detective Jones that he took the photographs with the digital camera and said that he had "staged the scene to make it look like a suicide so Ms. McClancy could benefit more through the VA benefits."

Charles Kaczmarczyk testified that he had pleaded guilty to a charge of conspiracy to commit first degree murder in exchange for a 25-year sentence for his role in the victim's death. Mr. Kaczmarczyk testified that he met the victim in January 2006 when they both participated in a residential treatment program for PTSD at the VA hospital in Nashville. Mr. Kaczmarczyk recalled that he and the other five program participants, including the victim, "pretty much all . . . mirrored the same prescription [medication] regimen," which included "Clonagin, Mirtazapine and Trazodone." He and the victim became close during the program, and, after the program ended at the end of February, Mr. Kaczmarczyk attended "a sort of reunion-type breakfast" for program participants and their spouses hosted by the victim and the defendant at "their home in Coker Creek." Mr. Kaczmarczyk recalled that as the program participants discussed their medication regimens and ongoing treatment programs on that day, he was struck by the defendant's detailed knowledge of the victim's medication regimen. He said that he "thought she was a pharmacist she knew so much about it." He added, "It appear[ed] that she knew each one of the medications, what the prescribed dosages were, when they

-4-

should be taken, what the contraindications were, just more information than the average person would have as far as medications."

Mr. Kaczmarczyk testified that he and the victim stayed in touch following the reunion breakfast and that, eventually, the victim invited him "to come back to his place to visit him." Mr. Kaczmarczyk said that he agreed to visit the victim because the victim "was having some problems" and "his PTSD was possibly out of control." He said that when he went to visit the victim, the victim, who had been very energetic and active during the residential program, had become "very lethargic." Mr. Kaczmarczyk continued to visit the victim and the defendant at the Coker Creek residence and began attending the victim's medical appointments at the VA. During this time, the victim never expressed any suicidal thoughts to Mr. Kaczmarczyk.

Mr. Kaczmarczyk testified that the defendant initiated a sexual relationship with him in April 2006. During that same period, the defendant cut her hair and died it blond. The defendant told him that she had cut her hair "out of spite" because the victim "liked long hair." Toward the end of April 2006, the defendant added Mr. Kaczmarczyk "as a card holder to the Discover card account" held by the victim and the defendant and provided Mr. Kaczmarczyk with a card for his use. During their courtship, the defendant "mentioned on several occasions that she would like to get rid of" the victim and said that "if he went away," she and Mr. Kaczmarczyk "could be together."

At the end of April 2006, the victim was hospitalized at the VA hospital in Johnson City following an apparent drug overdose. While the victim was hospitalized, Mr. Kaczmarczyk attended "a family meeting" with the victim, the defendant, and the victim's treatment providers that "was an ongoing overview of what his continued treatment would be when he was, in fact, released from the hospital." He recalled that at that meeting, the defendant agreed to be in charge of the victim's medication and stated that she would make sure that the victim took his medication as prescribed.

The victim was released from the hospital on May 13, 2006, and Mr. Kaczmarczyk drove him home to the Coker Creek residence. That night, the defendant prepared the victim's favorite meal, but when the victim "complained that it didn't taste very well," the defendant "put seasoning on it so that he would eat it." Later that evening, the defendant remarked to Mr. Kaczmarczyk "that she had used magic dust on it," which he interpreted to mean that she had put medication into the victim's food. Mr. Kaczmarczyk said that the victim's demeanor changed from "alert and oriented to somewhat lethargic, intoxicated, under the influence of drugs," and Mr. Kaczmarczyk attributed the change in the victim's demeanor to the defendant's tampering "with his food and medications." Mr. Kaczmarczyk maintained that the defendant managed the victim's medications at that time as she had been doing "everyday since he had been

-5-

released from" the residential treatment program. Mr. Kaczmarczyk spent the night at the Coker Creek residence with the victim and the defendant. The next day, May 14, 2006, the defendant told Mr. Kaczmarczyk that if he should happen to find the victim dead, he should "keep it simple," which Mr. Kaczmarczyk interpreted to mean that the defendant wanted him to "make it look as natural as possible or make it look like a suicide."

Mr. Kaczmarczyk again spent the night at the Coker Creek residence. He testified that he left the Coker Creek residence at approximately 6:45 a.m. on the following morning to attend some appointments in Knoxville. He said that when he left the residence, both the victim and the defendant were still there. The victim was in his recliner, and "[h]e appeared to be somewhat lethargic." When Mr. Kaczmarczyk returned to the Coker Creek residence later that afternoon, he found the victim "sitting on the floor with his pajamas kind of in a state of disarray." The victim called Mr. Kaczmarczyk by name and asked Mr. Kaczmarczyk "to help him get into his recliner back in the living room." Mr. Kaczmarczyk testified that he helped the victim into his recliner and then went to get the victim a bottle of water. The victim "drank some of the water. And at that point in time, he expired and vomited."

Although he believed that the victim had died, Mr. Kaczmarczyk did not immediately call 9-1-1. Instead, he "took some photos of the scene from the downstairs area and also from the upstairs area with him lying in his recliner" and then placed a bottle of pills . . . in his hand . . . and also a gun" before taking more photographs. He testified that he put the gun in the victim's hand because, during the residential treatment program, the victim "mentioned on several occasions that if he died due to his previous law enforcement experience, that he would like to die with a gun in his hand." Mr. Kaczmarczyk said that he also "emptied the pill keeper onto the table." He took the DNR order, which "was already on the table and had been since we returned from the hospital on Saturday," and placed it in a more prominent position. He said that he and the defendant had planned for the victim to be found while she was at work "[s]o it would be an alibi." He said that their planning took place the day before the victim's death.

Mr. Kaczmarczyk said that after the police found the photographs of the victim on his digital camera, he was arrested and charged with obstruction of justice. Mr. Kaczmarczyk acknowledged that he provided a statement to Detective Jones on the day of the murder wherein he claimed that the victim was dead when he found him and that he did not touch the victim, the pills, or the gun. In a second statement given that same day, Mr. Kaczmarczyk admitted that the victim was just barely alive when he arrived and that he had helped the victim to the recliner. He admitted that he "put the gun and the pills in his hand to make the scene look worse. I thought it might increase his VA claim," explaining that the victim had been previously declared 30 percent disabled. Mr.

Kaczmarczyk said that the defendant paid an attorney $50,000 to represent him. The charges were eventually dismissed after a judge ruled that the photographs on the camera were not admissible.

Following the victim's death, the defendant applied for "a benefit called DIC, which means dependent indemnity compensation through the VA. That was also known as the widow's pension." Additionally, "based on the information that he possibly had accidently overdosed, that it was the VA's fault for them not managing his medication better" the victim was retroactively declared 100 percent disabled, which resulted in an award to the defendant of "one hundred percent what they call widow's pension." He thought the amount was $3,000 per month. The defendant paid off a $50,000 loan for Mr. Kaczmarczyk, and he moved into the Coker Creek residence with the defendant. The defendant told him "that she had cut and pasted the will, [the victim's] original will, so that his sister . . . and his daughter . . . could not derive anything financially from him." On June 15, 2006, Mr. Kaczmarczyk and the defendant opened a joint bank account. They were married on October 7, 2006, in Las Vegas, Nevada, and then again on October 7, 2009, in Blue Ridge, Georgia. Mr. Kaczmarczyk said that the defendant insisted upon the second ceremony, telling him it was "a woman thing."

The defendant and Mr. Kaczmarczyk traveled extensively after the victim's death, beginning with a June 2, 2006 trip to Atlanta for a Jimmy Buffett concert. Mr. Kaczmarczyk identified the log of their travels kept by the defendant; the log included 27 separate entries. Mr. Kaczmarczyk testified that the defendant and the victim had never traveled very much because the victim was "pretty much a recluse." The defendant was laid off from her job in September 2006, and Mr. Kaczmarczyk's only sources of income were disability benefits from the VA and the SSA. Despite this, the couple continued to travel and even purchased a large motor coach in 2007. Sometime in 2010 or 2011, the defendant spontaneously said to Mr. Kaczmarczyk, "If anybody finds out whatever really happened to Bob, I will never see the light of day."

Mr. Kaczmarczyk testified that, prior to the victim's death, Mr. Kaczmarczyk had placed a bag of pills into the victim's gun safe after he and the defendant decided that, if they "planted pills around the property, it would give more credence to the fact that [the victim] had been misusing drugs, possibly committing suicide." He and the defendant invited the defendant's son, Brian McGavic,[1] to stay with them in 2007, and they had arranged for Brian McGavic to discover the bag of pills in the gun safe. Mr. Kaczmarczyk recalled that they told Brian McGavic "that there were pills

---

[1]     Both of the defendant's sons testified at trial, and her son, Sean McGavic, also testified at the hearing on the defendant's motion to suppress. Given Sean McGavic's role in the case, we will refer to him as Mr. McGavic and to Brian McGavic by both his first and last names.

in there, possibly pills that [the victim] may have used during his time of overdose," and Brian McGavic reported it to the police. Mr. Kaczmarczyk said that the pills discovered in the safe had actually belonged to him and that he and the defendant hoped that the discovery of the pills would operate in Mr. Kaczmarczyk's favor with regard to the charges that were pending against him at that time.

Mr. Kaczmarczyk, an Air Force veteran who served from 1972 until 2001, testified that despite having served only "a single day in Southeast Asia in Vietnam, which was the 29th and 30th of April in 1975 during the evacuation of Saigon," he portrayed himself as a war hero with a higher rank as part of "a hustle " to get "benefits and make money" without having to work. He said that he worked the "hustle" from 2005 to 2012 and that the defendant not only knew about his hustle but began one of her own during their time together. The defendant claimed to be a retired colonel from the United States Marine Corp and a former employee of the United States Department of State. Mr. Kaczmarczyk acknowledged falsifying his service record in order to increase the amount of benefits he received from the federal government and that he had pleaded guilty to federal offenses for that action. He said that he had been ordered to pay $659,000 in restitution to the various agencies from which he had obtained unearned benefits.

Mr. Kaczmarczyk testified that the defendant filed to divorce him in 2012, telling him "that if we got divorced and she was single, that it would be financially beneficial for tax purposes and some reason." Mr. Kaczmarczyk said that he "was incarcerated at the time," so her request "didn't really bother [him] one way or the other."

Mr. Kaczmarczyk testified that he provided a written statement to the TBI on December 20, 2012, while he was serving a federal prison sentence. In the statement, he said that the defendant had asked him "to bring over medication . . . and to mix the prescription medications up so that it would look like [the victim] was stealing them from me and saving them up." He did as she asked. He said that he knew that the defendant gave the victim "the drugs to overdose him, but . . . did not see her do this." He explained,

> My first understanding is that she was overdosing him by putting the medication in his food. Martha Ann told me that she was going to overdose Bob so that we could be together, and with his history of drug overdoses when she, quote, made him go away, end of quote, it would look like just another overdose that he had.

-8-

The defendant began putting large quantities of medication in the victim's food after the victim returned home from the hospital on May 13, 2006. Mr. Kaczmarczyk said that he knew that the defendant "was going to start medicating [the victim] heavily when we got back to the house from the hospital and he would probably die soon." He recalled that the defendant "was specific about how and when she wanted" Mr. Kaczmarczyk to check on the victim, asking him to check on the victim "at a specific time on the day that he died" so that Mr. Kaczmarczyk "would find him dead and she would be at work with an alibi." Mr. Kaczmarczyk said that when the defendant told him when to check on the victim on May 15, 2006, he "was pretty sure that she was going to give him a lethal dose of the drugs because he was so close to dying anyway, and she was so specific about me being there at a certain period of the day on that date." He acknowledged that he staged the scene with the pill keeper, the gun, and the DNR order. He said, "I thought it would look better and more like he had committed suicide."

Mr. Kaczmarczyk said that he was aware that the defendant had forged the victim's will by "manipulat[ing] the signature page of the will" and that she had done so "because she didn't want Bob's sister who lived in Florida to get any of Bob's assets." After the victim's death, the defendant "was able to remove Bob's name off of stocks that were in both of their names" and that were worth "around a hundred thousand dollars or more."

Mr. Kaczmarczyk said that, as far as he knew, the defendant planned to kill the victim so that they could be together and not for "financial reasons." He added that he "threw gas on the fire about that and told Martha Ann about now that Bob was dead she needed to apply to get Bob's Veterans Affairs benefits and his Social Security benefits."

Mr. Kaczmarczyk testified that, at some point, he had downloaded the photographs of the victim onto his computer and then later deleted them.

During cross-examination, Mr. Kaczmarczyk admitted that the defendant's desire to be rid of the victim was initially "emotional" because they wanted to be together. He acknowledged that, following the victim's death, he came up with ways that the defendant could benefit financially from the victim's death. Mr. Kaczmarczyk conceded that the victim "was very difficult with taking medications" as prescribed and that, as far as he knew, the defendant "was administering all [the victim's] medications because he had a tough time doing it himself."

Brian McGavic testified that he visited the defendant and Mr. Kaczmarczyk in July 2007 and that he "was back and forth between [Mr. Kaczmarczyk's] house in Knoxville and Coker Creek" until he returned to Florida in September 2007. At that

time, the defendant and Mr. Kaczmarczyk spent "[t]he majority of their time . . . in Coker Creek." Brian McGavic recalled a particular day when the defendant and Mr. Kaczmarczyk asked him to locate a lost tool and told him where the tool might be located. When Brian McGavic found the tool, he also found "a set of keys that would unlock the spin combination on the" large gun vault in the garage. The defendant and Mr. Kaczmarczyk gave Brian McGavic permission to open the vault and provided him with the combination. The vault contained only "a grocery store bag full of loose medications, mixed medications all out of their containers." Brian McGavic testified that the defendant and Mr. Kaczmarczyk reacted to the discovery with "shock and exasperation" and asked Brian McGavic to contact the sheriff's office. Although he thought it was odd that they should ask him to telephone the police rather than place the call themselves, he did as they asked. While waiting for the police to arrive, the defendant and Mr. Kaczmarczyk set up "a card table and a couple of chairs . . . in the middle of the driveway in front of the garage." Mr. Kaczmarczyk "had a digital camera and wanted to place himself . . . where he could take photographs of [Brian McGavic] and this deputy together as the deputy was separating, identifying and inventorying the medications that were found." Brian McGavic testified that he found the behavior of the defendant and Mr. Kaczmarczyk very unusual. When he inquired about their behavior, they "explained that they had planned on filing a lawsuit against Monroe County and that they were also planning on filing a lawsuit against" the VA and "that they were going to use this in their cases against both." Mr. McGavic said that "[w]ithout a doubt," he had come to believe that the defendant and Mr. Kaczmarczyk had manipulated him into "accidentally" finding the medications.

James Timothy Bridges, Adjunct Pharmacy Programs Manager at the VA Mountain Home Healthcare Center in Johnson City, testified that on February 23, 2006, the victim received 15 30-milligram tablets of Mirtazapine. Mr. Kaczmarczyk received 30 45-milligram tablets of Mirtazapine on March 13, March 28, and May 9, 2006. Mr. Kaczmarczyk filled prescriptions for Trazodone during this same period.

Martin Edward Smith, a pharmacist at the VA hospital in Murfreesboro, testified that the victim received 45 15-milligram tablets of Mirtazapine on March 1 and May 10, 2006, and that he was instructed to take one half pill each day. The victim received 30 50-milligram Trazodone tablets on January 6, 2006, and 15 50-milligram Trazodone tablets on January 13, January 23, and February 14, 2006. Mr. Kaczmarczyk received 30 30-milligram tablets of Mirtazapine on January 24, January 30, March 7, April 10, and May 5, 2006. Mr. Kaczmarczyk received 90 100-milligram tablets of Trazodone on January 12, February 2, February 24, March 20, and April 24, 2006.

Doctor Darinka Mileusnic-Polchan, Chief Medical Examiner for Knox and Anderson Counties and Medical Director of the Regional Forensic Center, testified that

the victim's autopsy was performed by Doctor Ronald Toolsie, who provided autopsies in Monroe County at the time of the victim's death. Doctor Mileusnic-Polchan testified that she had reviewed not only Doctor Toolsie's written autopsy report but had also examined the photographs taken during the autopsy and at the scene, the "ancillary studies, such as toxicology," and the "cystologic slides, such as samples of tissue that was taken at the time of the autopsy." Based upon her review, Doctor Mileusnic-Polchan concluded that the victim was in fairly good health aside from "a mild hypertension" observable by looking at slides from his heart, kidney, and brain. She noted edema in the victim's lungs and brain, which could have been attributed to "hypoxia or a lack of oxygen in the blood."

The toxicology report indicated that Trazodone and Mirtazapine were present in the victim's system "in the toxic ranges." Trazodone, which has a relatively short half-life of three to seven hours, was present in the victim's blood at 4200 nanograms per milliliter, which "was almost four times the maximum therapeutic range." Doctor Mileusnic-Polchan testified that it was her opinion that the Trazodone alone, even in that amount, would not have caused the victim's death. Mirtazapine, which has a very long half-life of 20 to 40 hours, was present in the victim's blood at 750 nanograms per milliliter, more than seven times the maximum therapeutic range of 100 nanograms per milliliter. She noted that Mirtazapine's long half-life made it "easier to overdose with a higher or more frequent dose." She said that Mirtazapine was, in this instance, the deadlier of the two drugs, explaining,

> The Mirtazapine in this level I would be more comfortable stating it as the only cause of death because it is definitely more toxic as far as causing some side effects, side effects being like a serotonergic syndrome or one of those, like stimulus neurologic syndrome that individuals can overreact because of chemical changes in the brain.

She added, "[T]he concentration of these particular drugs in this combination is definitely deadly because of all the side effects that they can cause."

Doctor Mileusnic-Polchan testified that the victim had no gastric contents, which indicated that he had not eaten within a "minimum of six hours." The absence of pill fragments in the victim's stomach indicated to Doctor Mileusnic-Polchan that the victim had not ingested the Trazodone and Mirtazapine as whole or half tablets. She observed that "a lot of these medications are in the tablet form that is designed for slow release" and that crushing the tablet would defeat the slow release mechanism, which, in turn, "might elicit sudden increase in the level of concentration." Doctor Mileusnic-Polchan said that, in a typical case of suicide by overdose, she would expect to "see a lot

-11-

of granular substance in the gastric content[s]" as well as "a lot of fluids to help all those drugs push down." Neither was present in the victim's autopsy. She added that she would have expected "much larger levels [of drugs] because when there is intent and there is an oral intake of the drugs, that elicits sudden surge of these mediations in the blood stream, then the layers are much higher." It was Doctor Mileusnic-Polchan's opinion that the victim "died of combination of the Trazodone and Mirtazapine, which is the main cause of death."

During cross-examination, Doctor Mileusnic-Polchan testified that brain edema like that present in the victim "is going to be the result of a protracted death, meaning that that is not sudden." Her review of the victim's hospital records from the last hospitalization before his death showed that "the Mirtazapine and Trazodone were not the drug that he was released with to go home."

The defendant's son, Sean Michael McGavic, testified that the defendant initially told him that the victim had died as a result of several mini strokes:

> [S]he said that he -- he was acting strange at the house and he was starting to have mini strokes. And she loaded him -- put him in her truck and took him to the hospital. And on the way to the hospital, he had another several mini strokes and she thought he died on the way to the hospital. And she had to pull the truck over and resuscitate him. And she, I guess, got him back and then got him to the hospital. And once he got in the hospital, he passed away sometime at the hospital.

When Mr. McGavic later visited the defendant at the Coker Creek residence, the defendant told him that the victim "had died of a heart attack at home." Finally, in 2008, the defendant told Mr. McGavic that the victim had died of a drug overdose.

Mr. McGavic testified that his relationship with the defendant had always been tumultuous and that, at some point in 2008, he and the defendant stopped speaking. In 2012, Mr. McGavic learned that the defendant and Mr. Kaczmarczyk were under investigation for federal benefits fraud. He said that he contacted the defendant in August or September 2012 after she was released on house arrest so that he could recover property from her that had originally belonged to his father and paternal grandparents. They began talking, and he went to help her clean out the Coker Creek residence. Mr. McGavic testified that, at that time, the defendant, anticipating a stint in federal prison, executed a durable power of attorney to allow him to conduct affairs on her behalf and provided him with the deeds to the Coker Creek residence and the Knoxville residence that she shared with Mr. Kaczmarczyk. She also gave him full control of all her

belongings, including three computers. When Mr. McGavic examined the contents of the computers, he "found some photos on" one of the computers given to him by the defendant "that . . . appeared to be [the victim] dead in different ways." He contacted the federal agents who were investigating the defendant at that time to alert them about the photographs.

In January 2013, the defendant contacted Mr. McGavic and said that she had been questioned about the victim's death and "wanted [him] to come over right away." When he arrived, the defendant was in the downstairs bathroom with the radio on "because she was afraid that . . . somebody [was] listening in." She told Mr. McGavic "that the TBI had come and questioned her about" the victim's death and, referring to the computers she had given him, said,

> I don't know if, you know, somebody is going to come to your house to get anything. But if you could, you may want to take those computers to . . . an IT person, to delete the information, have him go through these computers that I gave you and delete whatever is on them. And that way your kids can use them . . . .

During cross-examination, Mr. McGavic testified that Mr. Kaczmarczyk had signed the Knoxville residence over to the defendant and that the defendant had added Mr. McGavic's name to the deeds for both the Knoxville and the Coker Creek residences before she began her federal prison sentence. Mr. McGavic clarified that he had discovered the photographs of the victim on the computer before he had the conversation wherein the defendant told him to delete the information on the computers. Mr. McGavic maintained that the defendant and the victim had purchased the Coker Creek residence using money awarded to Mr. McGavic "from a car accident" and money that Mr. McGavic "had inherited from the time [he] was born." He acknowledged that the defendant had executed a quit claim deed to him for the Coker Creek residence, insisting that it had been purchased with his money and that no one was living in it.

TBI Agent Josh Melton testified that he was contacted by federal agents, who informed him "that there was information, intelligence information that might pertain to a death." He later received a written request for investigation from the Monroe County District Attorney's Office. After a brief conversation with Detective Jones, Agent Melton "made the independent decision as TBI that we were not going to view" the MCSO case file for the investigation of Mr. Kaczmarczyk.

Agent Melton spoke to Mr. McGavic, who indicated that he had computers, electronic storage devices, and documents that had been given to him by the defendant

-13-

and that pertained to the death of the victim. Mr. McGavic surrendered to Agent Melton documents and computers given to him by the defendant.

Among the documents was a durable power of attorney executed by the victim and filed June 15, 2006 with the Monroe County Register of Deeds; the second page of this document was marked with register book M172, page 769. Mr. McGavic also gave Agent Melton a document purporting to be the victim's last will and testament; the second page of this document was also marked as register book M172, page 769. Agent Melton observed,

> [T]he Last Will and Testament in its entirety is, as a whole[,] . . . a forgery. . . . [I]t has been manipulated, cut and pasted. The book, page numbers are cut and pasted on each page from the Durable Power of Attorney onto the will, on each one of those pages, and then all the signature lines and the filing dates are exactly the same on the end of the will as they are on the Durable Power of Attorney.

He noted that the certified copy of the durable power of attorney on file with the Monroe County Register of Deeds showed the book and page number at the bottom of each page. Agent Melton said that, upon examining the certified document, he determined that the durable power of attorney "was a real document that would have been . . . manipulated to falsify that will" and that the book and page numbers on the document purporting to be the victim's last will and testament are actually those from the durable power of attorney.

Agent Melton also identified two marriage licenses for the defendant and Mr. Kaczmarczyk, one issued in Las Vegas on October 7, 2006, and one issued in Georgia on October 7, 2009.

Agent Melton interviewed the defendant in January 2013, and she told him that the victim suffered from PTSD and "had a difficult time taking his prescription medications as were prescribed to him." She said that the victim "would skip taking medications as prescribed and then try to make up for them by taking more later." The defendant added that the victim "had been called out by a nurse practitioner for not taking his prescription medications correctly" while he was attending the six-week residential treatment for PTSD. The defendant said that the victim had overdosed in April 2006 and again at the end of April or beginning of May 2006. The defendant told Agent Melton that Mr. Kaczmarczyk was present when the victim overdosed in May 2006, which led to his death, and that he had taken photographs of the victim. She said that Mr. Kaczmarczyk told her that he had moved the victim to a chair in the living room and planned "to wait for her to get home so they could take him to the hospital as had been

done in the past." She said that, after he called 9-1-1, Mr. Kaczmarczyk put the victim's "service revolver in [the victim's] hand and sprinkled pills in his lap." The defendant said that Mr. Kaczmarczyk told her that he had staged the scene because he thought it would help her obtain veteran's benefits. The defendant said that after the victim's death, "she found pills stashed in several places" and that "[t]he pills that she found stashed were different kinds of prescription pills mixed together." She claimed that "she found multiple bottles of these mixed pills while moving some egg cartons in the garage" and "in an old washing machine in the laundry room."

The defendant said that she had married Mr. Kaczmarczyk in October 2006 but that the two had separated in March 2007. They later renewed their vows in October 2009. The defendant specifically denied having had a romantic relationship with Mr. Kaczmarczyk before the victim's death.

The defendant acknowledged that she had given Mr. McGavic a durable power of attorney to manage her affairs while she was incarcerated and that she had given Mr. McGavic a computer from the Coker Creek residence and had given him "an iMac computer to maintain that came from her residence in Knoxville." She said that she had instructed Mr. McGavic to retrieve the victim's medical records from the Coker Creek residence.

The defendant told Agent Melton that the victim had executed the will in 2004 before he had heart surgery, but she was not sure whether it had been filed at the courthouse. She said that she had a hard copy of the will. Agent Melton acknowledged during cross-examination that he could not establish that the will was forged prior to the victim's death.

Kathy Inzerillo, the victim's sister, testified that she remained in regular contact with the victim after he and the defendant moved to Tennessee from Florida in 1997 and that she visited him in Tennessee at least once a year. Ms. Inzerillo insisted that the victim had never expressed any suicidal ideation to her. Ms. Inzerillo testified that she received an email from the defendant's work email address at 8:48 a.m. on the day of the victim's death. In the email, the defendant described the victim as having violent mood swings following his return from the hospital. She told Ms. Inzerillo that the defendant's medication made him extremely lethargic and drowsy. Ms. Inzerillo recalled that the defendant telephoned her on the day of the victim's death and said that the victim "had overdosed himself." Ms. Inzerillo and her husband traveled to Tennessee for the victim's funeral, and the defendant arranged for them to meet Mr. Kaczmarczyk while they were there.

Ms. Inzerillo testified that she did not know that the defendant was in a relationship with Mr. Kaczmarczyk, but she "knew something was going on because," when questioned, the defendant "came up with this job that she had and she would be gone." Ms. Inzerillo testified that she communicated with the defendant by email on October 6, 2006, and that the defendant claimed to have been "at Nellis Air Force Base on a training assignment." The defendant told Ms. Inzerillo that she was going "to go to Key West Naval Air Station on November 1st. There is supposed to be quite a deployment into the station at that time and I will get yet a different type of training." Ms. Inzerillo testified that she received a letter from the defendant on October 6, 2006, with a return address of Nellis Air Force Base in Nevada. The defendant wrote that she had gotten a job working for the Secret Service and that she was anticipating an "overseas assignment." Of her new job, the defendant said:

> I didn't apply for this job. I actually got recruited. I am sure you remember that I hired a private investigator to help me after Bob died. He is a retired field supervisor with the FBI. He was talking to one of his cohorts in Washington one day and mentioned that he was working with a lady in East Tennessee who he wished had been a part of his unit when he was active. He told him how impressed he was with my abilities in different areas and the fact that I had worked law enforcement a number of years ago. He also told the fellow that I was wasting my time in a Podunk town with a deadend job. And since my husband had died and left me with no money and no benefits, he wished I had a better opportunity. The fellow here in Washington told him about this job and it sounded like I would be perfect for it. So, yes, there is no doubt about it, I was truly in the right place at the right time. They pulled strings and here I am.

When Ms. Inzerillo asked if she ever heard "from that Chuck fellow at all," the defendant replied, "Yes, I hear from him everyday," but she did not tell Ms. Inzerillo that they had been married. When Ms. Inzerillo asked the defendant whether she had listened to the 9-1-1 call and whether she thought Mr. Kaczmarczyk's behavior following the victim's death was odd, the defendant said that she had listened to the recording but did not believe Mr. Kaczmarczyk's behavior to be odd.[2]

---

[2] Other emails indicated the depth of the defendant's deception regarding the alleged Secret Service job. Following the admission of these emails, the trial court called a jury out hearing and stated its opinion that none of the emails was admissible and questioned why defense counsel had not objected to their admission. The trial court questioned the relevance of the emails as anything other than an attempt to inflame the jury.

Ms. Inzerillo testified that she received a letter from the defendant in September 2007 appended to which was a copy of a letter the defendant had sent to the victim's daughter and a copy of what purported to be the victim's will. In the letter, the defendant accused Ms. Inzerillo of defying the victim's "wishes that [the victim's daughter] not be contacted, made aware of his death." The defendant called Ms. Inzerillo "a busy-body and a know-it-all" because she had contacted the victim's daughter. The defendant said that she was surprised to think that Ms. Inzerillo thought the victim "would . . . ever leave anything -- everything that we owned unprotected and vulnerable to his no-good, lazy daughter and her worthless husband." The defendant repeatedly emphasized that the cause of the victim's death was an overdose of his prescribed medication and expressed outrage that Ms. Inzerillo did not agree. In the will appended to the letter, the victim left everything to the defendant, one dollar to his daughter and both of his stepsons, and purposefully disinherited his mother and sisters.

The victim's daughter, Teresa Guinn, testified that she had not actually spoken with the victim since the spring of 2003 and that her last contact with him was an email birthday card she received from him and the defendant in February 2006. Ms. Guinn insisted, however, that she had telephoned the victim on Christmas Day 2006 and left a message on the answering machine. Ms. Guinn testified that, at some point, Ms. Inzerillo called her and told her that the victim had died. Ms. Guinn said that she immediately telephoned the defendant and left a message but received no reply. Ms. Guinn acknowledged that she later wrote the defendant a letter wherein she indicated that an attorney had told her that she had "a 50 percent right to all" of the victim's "[b]elongings ranging from personal momentos [sic], household items, farm equipment, his 2003 F-250 truck and so forth" and that she wanted to discuss with the defendant how she "would like to go about dividing his things." Ms. Guinn said that she also expressed her interest in owning the Coker Creek residence in the letter. The defendant responded with a letter, a copy of the victim's will, and a money order for $1. The defendant pointed out that Ms. Guinn's relationship with the victim was acrimonious and that the two did not talk often. Ms. Guinn conceded that she later learned that she was not entitled to any of her father's belongings.[3]

Deborah K. Hartman testified that she and her husband were friends of the defendant and the victim and that they "spent a great deal of time with them." Ms. Hartman recalled that, before the victim went to the PTSD program in Nashville, "[h]e was the life of the party," but that changed when he returned. He came to visit the Hartmans' home less and less while the defendant and Mr. Kaczmarczyk started coming

---

[3] Out of the hearing of the jury, the trial court questioned the relevance of Ms. Guinn's testimony but noted that the defendant had not objected to its admission.

to their home together. During that same period, the defendant changed her appearance, cutting her long gray hair and dyeing it blond. The defendant told Ms. Hartman that the victim was "very, very upset, that he liked long hair and was not happy with the short." Ms. Hartman said that the new haircut made the defendant look 10 years younger.

After the victim's death, the defendant stayed with Ms. Hartman for "three or four days until . . . they gave her permission to go back to the house." On the day following the victim's death, the defendant spent several hours on the telephone trying to obtain the services of a lawyer for Mr. Kaczmarczyk.

The defendant and Mr. Kaczmarczyk often traveled with the Hartmans after the victim's death. Ms. Hartman recalled that the defendant and Mr. Kaczmarczyk bought "a large motor coach" and that the defendant bought "some beautiful diamond earrings." She said that the defendant's lifestyle improved dramatically. While on a cruise with some other friends in 2008, Ms. Hartman asked the defendant if she intended to marry Mr. Kaczmarczyk, and the defendant replied, "No, I can't do that because I would lose Bob's annuity, police annuity if I would get re-married." About a month after they returned from the cruise, the defendant and Mr. Kaczmarczyk told Ms. Hartman that they planned to get married as soon as the defendant turned 65.

SSA Special Agent Thomas Goldman testified that he investigated the defendant to determine whether she had obtained any benefits by fraud. Agent Goldman described the so-called widow's pension as a survivor's benefit payable as a $255.00 lump sum plus a monthly payment based on the deceased spouse's payment record. He said that a surviving spouse could also be eligible for a back payment of Social Security Disability benefits approved after the death of their spouse. He noted, however, that remarriage before age 60 would terminate both benefits. Agent Goldman testified that as part of his investigation of the defendant and Mr. Kaczmarczyk, he checked to see whether she "had filed for any benefits, specifically a lump sum death payment, or any back payments that [the victim] may have been due for disability." He learned that shortly after the victim's death, the victim's claim for Social Security Disability benefits based on his service-related PTSD had been approved and that the defendant received the funds as a lump sum check for $24,010 along with the $255 death benefit. The defendant also received a monthly benefit. Born on October 6, 1949, the defendant would have stopped receiving any of these benefits if she remarried before October 6, 2009.

During cross-examination, Agent Goldman agreed that the victim had applied for the disability benefits that resulted in the lump sum payment long before his death and that that money would have been paid regardless of his death. He clarified during redirect examination, however, that the victim's death was a factor in his being declared 100 percent disabled as a result of his PTSD.

-18-

VA Special Agent Nathan Landkammer testified that, at the time of his death, the victim was receiving a 30 percent disability benefit from the VA but that the amount "eventually increased to 100 [percent] after his death." He said that although the victim had some claims pending when he died, it was the claim filed by the defendant following the victim's death that raised the benefit from 30 to 100 percent. Agent Landkammer said that a program through the VA "for surviving family members of deceased military veterans who receive compensation benefits . . . entitles the surviving spouse to receive this monthly monetary benefit" for the rest of his or her life provided that the surviving spouse does not remarry before turning 57 years old. He noted that the defendant and Mr. Kaczmarczyk were married one day after the defendant's 57th birthday.

Agent Landkammer testified that on at least 13 separate occasions during his stay in the six-week in-patient treatment program, the victim denied having suicidal ideation. He noted that the treatment notes in the victim's file from the Mountain Home VA facility indicated that the defendant called the facility on May 18, 2006, to report that the victim had died from a likely drug overdose. The defendant also reported "that she had been administering his medications since his [discharge] from E2 two days previously and following instructions per this author's note of 5/5/06." The treatment notes from May 13, 2006, indicate that the victim told his treating physician that the defendant had "'cleaned the house of medications'" and that the overdose that led to his hospitalization at the beginning of May was a mistake and not intentional. The victim stated at least 50 times that he did not have any suicidal ideation.

During cross-examination, Agent Landkammer conceded that the intake notes for the victim's last hospitalization indicated that the victim's "friend claimed that he had a history of overdose, and . . . that the spouse said that he had told her he was attempting suicide." The victim had another suspected overdose in April 2006 but was not admitted to the hospital that time.

Shelly Lanelle Peterson, Assistant Veterans Service Center Manager for the VA Nashville Regional Office, testified that dependency and indemnity compensation is a tax-free benefit paid to survivors of service members who die on active duty or "who had a disability incurred or aggravated in service." A typical benefit was $1,215.00 per month. The defendant received dependency and indemnity compensation of approximately $92,000, plus "a month of death benefit" equal to $2,500.00, plus "an accrued benefit that was payable to her" of approximately $7,900.00. Ms. Peterson testified that at the time of the trial, the defendant was still receiving a benefit, albeit at a reduced rate due to her incarceration. Ms. Peterson said that at the time of his death, the victim was receiving a 30 percent disability benefit. After his death, the percentage was

increased by 10 percent based upon a system-wide review of certain veterans. The defendant then applied for an increase to 100 percent based upon the victim's death. The defendant's request was granted.

Following this testimony, the State rested, and the defendant elected to testify.

The defendant testified that the victim began struggling with PTSD before they were married. After Mr. McGavic was seriously injured in a car accident, the victim worked as his primary caregiver, and that seemed to trigger a recurrence in the victim's PTSD. The defendant said that she purchased the Coker Creek residence with proceeds from the sale of the home she received as part of her first divorce settlement. She recalled that she and the victim initially took out a $50,000 mortgage on the property for the purpose of establishing good credit in the community, but they paid the mortgage off quickly. The defendant said that she also paid cash for an additional five acres that abutted the Coker Creek property. Despite these large cash outlays, the defendant maintained that she still had significant liquid assets "from the original divorce, and some of them from when [she] was a child."

The defendant said that the victim eventually elected against the defendant's wishes to retire early because his PTSD was getting worse. She said that she was forced to take a job with insurance and benefits because "retiree insurance" was so expensive. She said that she and the victim also started a cleaning business and that the victim performed lawn maintenance. She said that they also sold eggs from the chickens that they raised, and she noted that she sold the eggs at a discount to poor people.

Eventually, the victim learned that he was entitled to veteran's benefits based upon his service in Vietnam. The victim finally began the process of obtaining those benefits in 2003. Around that same time, the victim began visiting both a primary care physician and a psychologist at a VA clinic in Knoxville. The defendant said that the medication and therapy helped with the victim's PTSD. When his improvement seemed sporadic despite all the treatments, the victim admitted to the defendant that "he was messing with his medicine." She said that he stopped taking his medication when he began to feel better, and then, when he started to feel bad again, "he just goes back and gets a whole handful and takes it." She said that "he did the same thing with the psychotropic drugs that were prescribed for him for his PTSD." The victim continued to do this despite the defendant's warning him to stop. The defendant said that the victim refused to allow her to manage his medication at that time.

The defendant testified that the victim's PTSD continued to worsen and that, on one occasion in 2005, she awakened at 3:30 a.m. to find that the victim had left

the residence on foot. He arrived home at approximately 5 a.m. "in full military camouflage" and carrying three weapons. She said that the victim told her that "he was out walking the perimeter." She recalled that, later that morning, the victim seemed to "come to himself" and did not understand why he was dressed the way he was. At that point, the victim admitted that he needed more help. Eventually, after the defendant threatened to leave him, the victim entered the six-week PTSD program in Nashville.

The defendant testified that the victim called her "excited about . . . his roommate," Mr. Kaczmarczyk, whom he described as "a wonderful guy." The victim told the defendant at one point that he "had been called out in front of the class one day for not taking his medication properly." The class was apparently canceled after an incident that involved Mr. Kaczmarczyk, and the victim was very upset that they didn't get to have their graduation. The defendant said that, when the victim returned from the program, he was better in some ways "but in the majority of ways" he was not.

She and the defendant hosted a get-together for the program attendees at the Coker Creek residence on the weekend after the program ended, and Mr. Kaczmarczyk attended. The defendant said that the victim and Mr. Kaczmarczyk "stayed in very close contact with one another," talking on the phone daily and visiting each other's houses. Mr. Kaczmarczyk spent the night for the first time at the end of March 2006. At that time, the victim seemed to be doing better and "appeared to be taking his medication correctly." The defendant recalled that the victim injured his back and had an incident where he took too much pain medication. At the beginning of May, there was an incident when she and Mr. Kaczmarczyk had difficulty waking the victim for dinner. They took him to the emergency room, and the victim "admitted to them that he had taken too much medication." The victim was hospitalized, and, at the end of that hospitalization, the victim agreed to allow the defendant to have control of his medication.

The victim came home on May 13, 2006. The defendant said that she was "astonished that they were turning him loose and not making any effort to get him into a long-term program." She asked Mr. Kaczmarczyk to pick the victim up from the hospital and drive him home. The defendant recalled that, when he got home, the victim "had a deer in the headlight look" and thought he was "back in the 1970's, after he had returned from Vietnam." On the following day, the victim fell on the stairs. The defendant recalled that Mr. Kaczmarczyk stayed at the Coker Creek residence because he and the victim were planning to go to Orlando for a reunion of their military unit. She said that she and the victim argued because he would not let her apportion his medication for the trip. She claimed Mr. Kaczmarczyk overheard the argument and told the victim to let the defendant control the medication.

-21-

The defendant said that on the day of the victim's death, the three of them ate breakfast together, and then she left for work. Mr. Kaczmarczyk left at the same time as she did to go to Knoxville to retrieve his things for the trip to Orlando. The defendant said that when she returned home from work, she saw "emergency vehicles everywhere." The defendant said that the police would not allow her to enter the residence until several days after the victim's death and that she stayed with Ms. Hartman during that time. She testified that she was shocked when she learned that Mr. Kaczmarczyk had been charged in relation to the victim's death. When the police told her that Mr. Kaczmarczyk had altered the scene and taken photographs, she "didn't understand why he would do something like that."

The defendant said that after Mr. Kaczmarczyk was released from jail, she took him his truck and suitcase, and Mr. Kaczmarczyk denied having any involvement in the victim's death. He told her "that he made those pictures, that he sprinkled the pills and the deal with the gun, because he wanted to make pictures that he thought would help me with the V.A." The defendant adamantly denied sprinkling medication on the victim's food: "That is an absolute, out and out lie. I never ground up any of his medication. I never attempted to kill my husband. I didn't want him dead. I still wish he was around today." She also denied discussing killing the victim with Mr. Kaczmarczyk: "I don't know where he has come up with this. I, I have my ideas but he's never told me where he cooked this up. I never heard this story before he and I were arrested in July of 2012." She said that she had no reason to kill the victim for financial gain because she had her own money.

The defendant claimed that she and the victim "had wills, living wills, and powers of attorney that mirrored each other" and that they took all six documents to be "witnessed and notarized" in January 2004. She said that "[t]he one document that in shuffling all of the papers that we did not get signed and notarized was his will." The defendant said that she first realized that the victim's will had not been signed or notarized when she looked at it in August 2007. She claimed that Mr. Kaczmarczyk took "the real will that [the victim] had drawn up and had cut and pasted it to fit the pages of his power of attorney to where it looked like it had been signed and notarized, but it never was. It was fake in that issue." She insisted that "[t]he contents of the will were [the victim's] wishes but he never signed it the day that we were at the bank, and so that was how the will got . . . falsified." (ellipsis in original). She said that she did not object to Mr. Kaczmarczyk's altering the will and admitted that she had mailed a copy of the will to Ms. Inzerillo and Ms. Guinn.

The defendant testified that shortly after the victim's death, Mr. Kaczmarczyk invited her to attend a Jimmy Buffet concert with him in Stone Mountain, Georgia, and she went. She said that they shared a hotel room but not a bed during the

trip. After that trip, Mr. Kaczmarczyk continued to come to the Coker Creek residence to help her with yard work and take care of the animals. The defendant agreed to loan Mr. Kaczmarczyk the money to hire an attorney to represent him on the original Monroe County charges related to the victim's death. She insisted that they were not romantically involved when she loaned him the money and maintained that they were not romantically involved before the victim's death. The defendant said that she agreed to travel to New England with Mr. Kaczmarczyk to visit his family on the week of July 4, 2006, and she became romantically involved with Mr. Kaczmarczyk during that trip.

The defendant testified that she agreed to marry Mr. Kaczmarczyk in October 2006 because she needed back surgery but had been laid off from her job and, as a result, had lost her health insurance coverage. She said that Mr. Kaczmarczyk offered to add her to his insurance policy and agreed that they did not have to tell anyone that they were married since it was "nothing but a business deal." She said they were romantically involved at the time but that she "wasn't in love with the man." The defendant said that she lived with Mr. Kaczmarczyk at the Knoxville residence during the winter of 2007, but the couple separated at some point after she saw an email that Mr. Kaczmarczyk had written to another woman. The defendant testified that in May 2007, while living alone at the Coker Creek residence, she "overdosed on some pills, and [Mr. Kaczmarczyk] came in and came down to the house and found me." After she "had sobered up," Mr. Kaczmarczyk told her that she needed to pursue psychiatric help at the VA. At some point, the defendant mortgaged the Coker Creek residence to pay for the motor coach. She finally agreed to "openly" marry Mr. Kaczmarczyk in October 2009.

The defendant admitted lying to Ms. Inzerillo about her having a job with the Secret Service, saying, "I mean, it was just a hoax. That's all in the world it was, was a hoax to more or less get her to stop bugging me." She said that she even sent letters to Ms. Hartman's daughter who lived in Maryland to have her mail them to Ms. Inzerillo to make it look like the mail had originated in D.C. She said that she and Mr. Kaczmarczyk "hatched that up together."

After she and Mr. Kaczmarczyk were arrested and charged with federal offenses, she hired a private investigator who found out that Mr. Kaczmarczyk was "a fraud" and a "con man." The defendant testified that she filed for divorce from Mr. Kaczmarczyk in December 2012 after she spoke to the private investigator. After that, Mr. Kaczmarczyk told "this wild concocted story of [her] having murdered [the victim] for the first time." The defendant added,

> I did not kill Bob McClancy. I did not have anything to do
> with killing Bob McClancy. I cannot tell you anything more
> than what I know, that he died of a drug overdose. I know

-23-

that when he died, I begged Dr. Toolsie to please not put on his death certificate that it was a suicide, because as a Catholic, Bob could not have had a Catholic funeral if it had been ruled a suicide, and I begged them not to do that. I said, "None of us know what his state of mind was when this happened."

The defendant testified that two weeks before she was scheduled to be released from federal custody, she was charged with murder in Monroe County and that she had "sat in Monroe County jail for 76 weeks."

During cross-examination, the defendant insisted that Mr. McGavic lied when he said she had used proceeds from his civil settlement to pay for the Coker Creek residence. She also said that Mr. McGavic lied when he said she told him the victim had died of a stroke, but she admitted that she told "everybody at first that he had died of a heart attack because I did not want that dirty linen aired that he had died of an overdose." The defendant denied telling personnel at the VA that she would agree to be in charge of the victim's medication, saying, "I remember telling them that I worked two jobs and could not be in charge of it. That's why they needed to keep him." She acknowledged that the log that she kept indicated that on Sunday, May 14, 2006, she woke the victim "at 6:30 in order to administer new drugs in manner mandated by Dr. Hendricks." The defendant admitted that in July 2007 she prepared a statement to the VA on behalf of Mr. Kaczmarczyk that indicated that she was administering Mr. Kaczmarczyk's medications and that he was not doing well.

The defendant admitted that she had cut and died her hair but insisted that she had not done so until after the victim's death. She admitted that she had lied to the victim's daughter about the location of the victim's ashes. She also conceded that she had given the will and power of attorney documents to Mr. Kaczmarczyk so that he could alter them and that she had sent the forged will to the victim's family members.

Based upon this evidence, the jury convicted the defendant as charged of conspiracy to commit first degree murder but convicted her of the lesser included offense of attempted first degree murder in lieu of the charged offense of first degree premeditated murder. Following a sentencing hearing, the trial court imposed consecutive sentences of 25 years, the maximum within the range, for the defendant's convictions. The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

In this timely appeal, the defendant challenges the rulings of the trial court with respect to her motions to suppress the photographs taken by Mr. Kaczmarczyk of the

victim following his death, to exclude evidence of acts committed by her and Mr. Kaczmarczyk following the victim's death, and to declare a mistrial when Agent Melton commented on the defendant's having terminated their January 2013 interview on the advice of her counsel as well as the court's ruling admitting into evidence photographs taken of the victim during the autopsy. The defendant argues that certain of the trial court's comments amounted to an improper commentary on the evidence and that his negative comments to and about her deprived her of the right to a fair trial. The defendant challenges the sufficiency of the convicting evidence, arguing that the State failed to present sufficient evidence to corroborate Mr. Kaczmarczyk's testimony implicating her in the victim's murder and that even Mr. Kaczmarczyk's testimony failed to establish that they had planned to murder the victim in order to benefit financially. Finally, the defendant contends that the trial court erred by imposing consecutive sentences, arguing that her convictions should be merged because dual convictions violate principles of due process. We consider each claim in turn.

## I. Suppression

The defendant asserts that the trial court erred by denying her motion to suppress the photographs of the victim taken shortly after his death by Mr. Kaczmarczyk. She argues that, because the photographs were suppressed by a different trial judge in the original case charging Mr. Kaczmarczyk with evidence tampering and criminally negligent homicide, they should have been suppressed in her case as the fruit of the original unconstitutional search. She also argues that Mr. McGavic lacked the authority to give the computers that contained the digital images to the TBI because she had placed them in his possession only for safekeeping. Finally, she asserts that the search warrant was insufficient to permit the TBI to examine the contents of the computers.

At the suppression hearing, Detective Jones testified as he did at trial that he responded to the 9-1-1 call placed from the victim's Coker Creek residence. While at the residence, Detective Jones observed photographs of the victim on a digital camera at the scene. The photographs depicted "[the victim] in a recliner, appeared to be deceased, and then there was some more photos, of the . . . same recliner, of [the victim] holding the pill bottle. Then the other photo was [the victim] holding a pistol and a pill bottle." After observing the photographs, officers transported Mr. Kaczmarczyk to the sheriff's office, where Detective Jones interviewed him at approximately 10:00 p.m. Mr. Kaczmarczyk was later placed under arrest, and he remained in custody for three days.

Detective Jones said that, after Mr. Kaczmarczyk was charged in the victim's death, Mr. Kaczmarczyk moved to suppress the photographs. The trial court granted the motion, ruling that the police needed a search warrant to access the digital camera at the scene. The suppression of these photos led to dismissal of the case.

-25-

Mr. McGavic testified that after the defendant had been charged in federal court, she was placed on house arrest. While she was on house arrest at the Coker Creek residence, she executed a durable power of attorney that granted Mr. McGavic authority over all her affairs. She provided him with keys to both the Knoxville residence and the Coker Creek residence. The defendant gave Mr. McGavic three computers and told him that they were for him and his children to use; she told him to let the kids "have free reign on" the Apple computers in particular. Mr. McGavic testified that after he let the children use the computers, one of his children found a photograph of one of Mr. McGavic's nephews inside a casket following the nephew's death. At that point, Mr. McGavic decided to look through the rest of the photographs on each of the computers to make sure the children didn't find anything else that was inappropriate. He found pictures of the victim in the computer's "trash bin"; the victim appeared to be deceased. In some of the photographs, the victim

> had a gun in one hand and no gun, and the next picture he didn't have a gun. In one picture, he was laying a different way or position, and in the next picture he was in another position. In another photo, . . . the kitchen was in disarray, and then the next photo, the kitchen was just fine. And then in another photo, there were pills on the kitchen table, and in the next photo, there weren't pills on the kitchen table.

After observing the photographs, Mr. McGavic unplugged the computers "and didn't mess with them anymore." He then contacted Agent Landkammer to report what he had seen and to ask the agent to come and get the computers. Mr. McGavic later gave the computers given to him by the defendant to Agent Melton. In a telephone conversation after Mr. McGavic's discovery of the photographs, the defendant told him that he "should try to get rid of these photos off of the computers." Later, during a face-to-face visit, the defendant asked him "to have [his] I.T. friend delete the photos."

During cross-examination, Mr. McGavic testified that the federal agents "never looked in the computer" and refused to take possession of any of the computers. He recalled that when Agent Melton came to retrieve the computers, he had a search warrant and was accompanied by agents from the VA and SSA. He said that agents of the TBI executed two search warrants, one dated November 15 and one March 15.

Agent Melton testified that he received information from the office of special investigations for the VA and the SSA that the defendant had given Mr. McGavic some computers that might contain information related to the victim's death. Agent Melton testified that although Mr. McGavic was eager to turn the computers over to the

-26-

TBI, he obtained warrants to search the defendant's Knoxville residence, the McGavic residence, and the contents of the computers and other digital media. Additionally, Agent Melton asked both Mr. McGavic and his wife to execute consents to search the computers, digital media, and documents that Mr. McGavic provided to Agent Melton.

Agent Melton testified during cross-examination that his investigation began when agents of the VA and SSA conducting "an investigation completely unrelated" to the victim's death contacted the TBI. It was his understanding that, during that investigation, documents were uncovered "that led suspicion to the fact that potentially a death investigation should be opened." Agents conducting the other investigation contacted the United States Attorney's Office, which "pointed them in the direction of the State." Later, agents of the SSA and the VA met with representatives of the Monroe County District Attorney's Office and the MCSO, "at which time a determination was made that this was a case that needed [to] be investigated primarily by the Tennessee Bureau of Investigation." The case was then delegated to him because he was assigned to Monroe County.

Agent Melton said that of particular interest to the authorities was "a Last Will and Testament that they felt had been forged, and then a voluminous amount of documents that had been submitted to Veterans Affairs . . . that appeared to be suspicious in nature." After Agent Melton was assigned to the case, he contacted Detective Jones to find out what had led to the suppression of the evidence in the earlier case "so that we could remain as sterile as we could with our investigation and not taint anything." He said that he made a point not to retrieve the old case file.

At the conclusion of the hearing, the trial court found all of the witnesses[4] to be credible and specifically found Mr. McGavic's "credibility to be very high." The court denied the defendant's motion to suppress. The court first found that the defendant no longer had an expectation of privacy in the computers because she no longer owned the computers, no longer retained a possessory interest in the computers, and took no steps to keep the information contained on them private or to exclude others from viewing the information. The court found that the defendant abandoned the property to Mr. McGavic:

> The first basis for my ruling is I think [the defendant]
> relinquished an expectation of privacy to this property. I
> don't believe she has standing. That's the first basis, and I'm
> gonna go through many alternatives to say why this evidence

---

[4] A TBI Forensic Scientist also testified about the process used to recover the photographs and the location of the photographs on each computer's hard drive. We have not included that testimony because it is not relevant to the determination of the issue presented.

is admissible, but I don't think she any longer had the ability to come into court and say, "That's mine. You couldn't do that because it's mine." An individual has no right to the possession of contraband or evidence of illegal activity. . . . Courts are to make two inquires: one, whether the individual by their conduct has exhibited an actual subjective expectation of privacy. I do not find even that first prong in this case. The testimony was she gave it up. She gave it to Mr. McGavic. She gave him not only the property, but she gave him power of attorney. . . . She voluntarily relinquished it. And when she did that, I don't think she exhibited any personal subjective expectation in privacy. . . .

And the second prong is whether that . . . individual's subjective expectation of privacy is one that society or this Court is prepared to recognize as reasonable. I don't feel it's reasonable for her to say now that she has an expectation in those, those computers and in those floppy discs. She gave it all up. She gave power of attorney back in 2012. . . . I just don't think with the facts as they [were] presented, this Court or society would think that she has a right recognized as reasonable.

The court also found that the computers were in the exclusive possession and control of Mr. McGavic and that he gave consent to search the computers. Finally, the court found that the search warrants were valid because Mr. McGavic qualified as a citizen informant, and "the inherent details contained within the four corners" of the warrant affidavit supported the probable cause finding.

The trial court expressed concern with the fact that the warrants were issued in Bradley and Monroe Counties for property that was located at Mr. McGavic's residence in Cumberland County but ultimately concluded that this factor did not affect the validity of the warrants because they were issued by a court with statewide jurisdiction to the TBI, which also has statewide jurisdiction.

As to the defendant's claim that the photographs should be suppressed as the fruit of the earlier unconstitutional search, the court found that the search of the computers was attenuated in time and circumstances: "You're talking about years later and a concerned citizen finding the same evidence but in separate electronic form in different electronic media, years later. . . . Nothing that was done by the State in this

case is a product of the illegal search of that digital camera, nothing." He described the two cases as "two ships passing in the night."

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). The constitutional protections against unreasonable search and seizure "are personal in nature, and 'they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.'" *State v. Cothran*, 115 S.W.3d 513, 520 (Tenn. Crim. App. 2003) (quoting *State v. Ross*, 49 S.W.3d 833, 840 (Tenn. 2001)). "One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place where property is searched." *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991) (citing *Rawlings v. Kentucky*, 448 U.S. 98 (1980); *State v. Roberge*, 642 S.W.2d 716, 718 (Tenn. 1982)); *see Katz v. United States*, 389 U.S. 347, 357 (1967); *see also State v. Prier*, 725 S.W.2d 667, 671 (Tenn. 1987) (stating that our state constitution affords no greater protection than the federal constitution and adopting the *Katz* standard). Thus, we must determine "(1) whether the individual had an actual, subjective expectation of privacy and [if so] (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Ross*, 49 S.W.3d at 839). The second part of this inquiry focuses on "whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 357).

Because the Fourth Amendment protects people and privacy rather than places and property, a property interest does not determine standing to challenge a search and does not control the right of officials to search and seize. *See Oliver v. United States*, 466 U.S. 170, 183 (1984); *Katz*, 389 U.S. at 351, 353. As the Supreme Court has

recognized, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S. at 351 (citations omitted). Importantly, a "person can lose his reasonable expectation of privacy in his real property if he abandons it." *United States v. Harrison*, 689 F.3d 301, 307 (3d Cir. 2012). "Abandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item." *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (citing *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)). Consequently, "abandonment," as understood in the constitutional context of unreasonable searches and seizures, "is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search." *United States v. Veatch*, 674 F.2d 1217, 1220-21 (9th Cir. 1981).

Our supreme court has noted that a reviewing court should consider whether the individual has an ownership interest in the place searched, whether he has a possessory interest in the place searched, whether he has the right to exclude others from the place, and whether he undertook normal precautions to maintain the privacy of the place searched to determine whether an individual had a legitimate expectation of privacy in the place searched. *See Oody*, 23 S.W.2d at 560.

We agree with the ruling of the trial court that the defendant abandoned the computers, and, by extension their contents, when she gave them to Mr. McGavic and told him to "have free reign" with them. Nothing suggests that the items were placed in Mr. McGavic's possession solely for safe keeping. Instead, the accredited evidence established that the defendant had forfeited both her property and possessory rights to the computers. Furthermore, the record establishes that the defendant knowingly exposed the contents of the computers to Mr. McGavic and his family members. We hold, therefore, that the defendant had no reasonable expectation of privacy in the computers or their contents. Consequently, because Mr. McGavic consented to allow the TBI to seize and search the computers, the seizure and subsequent forensic search did not violate the defendant's constitutional rights. *See State v. Ledford*, 438 S.W.3d 543, 554 (Tenn. Crim. App. 2014).

Moreover, this is not a situation where the TBI, having come into legal possession of the computers from a third party, was constrained to obtain a warrant for the eventual viewing of the images at issue. In *Walter v. United States*, the Supreme Court found that although the FBI had lawfully acquired possession of obviously pornographic films when they were tendered to the FBI by the unintended recipient of the films, the FBI could not view the films because the unintended recipient had not actually

viewed the films. *See Walter v. United States*, 447 U.S. 649, 657 (1980). The Court held that because the FBI's possession of the films was predicated upon a private-party search for which there was no Fourth Amendment protection, the agents could not go any further than the initial private-party search. *Id.* at 656, 658-59 (1980) ("[T]here was nothing wrongful about the Government's acquisition of the packages or its examination of their contents to the extent that they had already been examined by third parties."). Here, however, it was Mr. McGavic's review of the challenged images that prompted him to tender the abandoned computers to the TBI. In consequence, the Fourth Amendment placed no limitation on the State's use of the property. *See California v. Greenwood*, 486 U.S. 35, 40 (1988); *Abel v. United States*, 362 U.S. 217, 241 (1960) ("There can be nothing unlawful in the Government's appropriation of such abandoned property."); *Fulani*, 368 F.3d at 354. Thus, the search warrants were superfluous, and we need not examine their efficacy. *See Ledford*, 438 S.W.3d at 554-55.

Finally, we find no merit to the defendant's claim that the suppression of the photographs in the earlier case against Mr. Kaczmarczyk bars the use of the photographs in this case. Just as the defendant had no standing to challenge the search of the computers because she had abandoned them, she had no standing to challenge the search of Mr. Kaczmarczyk's digital camera because it did not belong to her. The warrantless search of Mr. Kaczmarczyk's camera could not have violated the defendant's constitutional rights because she had no property or possessory interest in the item. Furthermore, even if the defendant had standing to challenge the search of Mr. Kaczmarczyk's camera, both the independent source doctrine and the attenuation doctrine would operate to purge any potential taint from the earlier unconstitutional search.

When a claim has been made that evidence is "fruit" of an unlawful search, the evidence may nevertheless be admissible if it fits within one of several recognized exceptions to the exclusionary rule. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). The question to be answered is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Brown v. Illinois*, 422 U.S. 590, 598-99 (1975) (citation omitted). By way of example, the Supreme Court explained,

> Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence. First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. Second, the inevitable discovery

doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. Third, . . . is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."

*Strieff*, 136 S. Ct. at 2061 (citations omitted).

"In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." *Murray v. United States*, 487 U.S. 533, 538-39 (1988) (quoting *United States v. Silvestri*, 787 F.2d 736, 739 (1st Cir. 1986)). Here, the photographs used in the case were obtained from computers voluntarily relinquished to the TBI by Mr. McGavic, which served to remove any taint associated with the earlier unconstitutional search of Mr. Kaczmarczyk's digital camera. Thus, even assuming for the sake of argument that the earlier suppression of the camera contents operated to bar the use of the photographs *on the camera*, for the reasons discussed above, nothing prevented the admission of the photographs *on the computers*.

"The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." *Strieff*, 136 S. Ct. at 2061. When making this evaluation, a reviewing court considers three factors:

First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider "the presence of intervening circumstances." Third, and "particularly" significant, we examine "the purpose and flagrancy of the official misconduct."

*Id.* at 2061-62 (citations omitted). In this case, six years elapsed between the unconstitutional conduct that led to the suppression of the photographs from Mr. Kaczmarczyk's digital camera and the discovery by Mr. McGavic of the photographs on the computers given to him by the defendant. The transfer of the photographs to the computers and of the computers to Mr. McGavic were intervening circumstances between the primary illegality and the TBI's search of the computers. Finally, the record

clearly establishes that the TBI did not exploit the earlier illegality to obtain the photographs from the computers.

Under these circumstances, the trial court did not err by denying the defendant's motion to suppress.

## II. Motion in Limine

Prior to trial, the defendant moved the trial court to exclude evidence of both the defendant's and Mr. Kaczmarczyk's bad acts undertaken following the victim's death on grounds that Mr. Kaczmarczyk told the TBI that they had not contemplated the acts prior to the victim's death. The State argued that some of the actions undertaken by the defendant and Mr. Kaczmarczyk after the victim's death were evidence of the conspiracy to murder the victim in order to fraudulently obtain government benefits. The trial court denied the motion, observing, "I think the law is pretty clear that that embodies subsequent acts to avoid detection and prosecution for the crime . . . ." The trial court also observed that the defendant had not been sufficiently specific with the particular evidence she wanted excluded. The court invited the defendant to reassert her motion with specificity at a later date and concluded that prior bad act evidence would not be admissible without a jury-out hearing beforehand. The trial court specifically denied the defendant's motion to exclude evidence that the defendant benefited financially from the victim's death.

In this appeal, the defendant again argues that the trial court should have excluded evidence that the defendant and Mr. Kaczmarczyk "had financial gain after the death of the alleged victim" because Mr. Kaczmarczyk "denied that the conspiracy was for any financial gain." As she did in the trial court, the defendant fails to point to any particular piece of evidence or testimony that she believes should have been excluded. Because she has also failed to advance a legal basis for her claim that the evidence should have been excluded or to support her argument with citation to relevant authorities, she has waived our consideration of this issue. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *see also* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on").

### III. Autopsy Photographs

The defendant contends that the trial court erred by admitting photographs of the victim taken during the autopsy because they were not relevant to any issue presented at trial. The State asserts that the trial court did not err.

At the conclusion of Doctor Mileusnic-Polchan's testimony, the State moved to introduce the entire autopsy report, which contained 18 photographs. The defendant objected on grounds that the photographs were more prejudicial than probative. The trial court excluded two photographs that depicted the victim's body cut open during the autopsy process but allowed the other 16, which included images of the victim in various states of undress on the autopsy table and slides from his internal organs.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

"Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). "The general rule . . . is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *Carter*, 114 S.W.3d at 902 (quoting *Banks*, 564 S.W.2d at 950-51). Even relevant photographs may be excluded, however, if their probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks,* 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest

decision on an improper basis, commonly, though not necessarily, an emotional one."
*See Banks*, 564 S.W.2d at 951. "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *State v. Odom*, 336 S.W.3d 541, 565 (Tenn. 2011) (citing *Banks*, 564 S.W.2d at 949).

The photographs admitted in this case are not particularly gruesome or horrifying; nor, however, are they particularly relevant to any issue presented at trial. The parties agreed that the cause of the victim's death was an overdose of his prescription medications, and the only issue presented at trial was whether the victim ingested the drugs on his own, either accidentally or intentionally, or whether the defendant had intentionally overmedicated the victim through nefarious means. None of the photographs taken during the autopsy made any fact of consequence to the determination of that issue more or less probable. Because the photographs were not relevant, they should have been excluded. That being said, it is our view that the erroneous admission of the photographs was harmless precisely because they are neither gruesome nor horrifying. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

*IV. Motion for Mistrial*

The defendant next contends that the trial court erred by denying her motion for mistrial when Agent Melton stated during direct examination that the defendant had elected to end their interview after consulting with her attorney. She argues that the statement was an improper referrence to her exercising her constitutional privilege against self-incrimination. The State asserts that the trial court did not err.

During Agent Melton's direct examination testimony, he made the following statement when describing his January 13, 2013 interview of the defendant:

> I will, I'll tell you up front that at some point in the statement,
> out of professional courtesy to her counsel, I took him outside
> and told him the direction of where we intended to go with
> that interview, and asked him if he would, wanted to speak
> with her, and he did and, want to speak with her and he
> wanted to discontinue the interview.

The defendant objected and moved for a mistrial because the statement referenced the defendant's "refusal to talk to them and that's an infringement on her right to remain

silent."  The trial court agreed that the statement was improper and offered to give a curative instruction, but defense counsel declined, saying, "Your Honor, it's one of those things that sometimes I think a jury instruction just makes it worse."  The court noted counsel's timely objection, admonished the State, and again offered a curative instruction.  Counsel again declined, noting, "I don't think it will help.  I think it will hurt even worse than she's already been prejudiced."  The court denied the mistrial request:

> Well, a mistrial is the most Draconian of all measures, and I do not feel it's warranted in this case.  You objected so timely, I'm not sure that anyone really even heard it.  All he was talking about is she spoke to counsel; that's her right.  I think it's in the sound discretion of the Court.  I'm not gonna declare a mistrial.  It just wasn't overly prejudicial, of all the things we've heard during the course of this trial, things that sometimes you've elicited for strategy purposes or otherwise.  You know, she's got federal time, a federal conviction.  I don't think it causes any prejudice, so I'm gonna deny that, but I will offer to give a curative instruction.

Defense counsel again rejected the offered curative instruction on grounds that he believed such an instruction "would be more detrimental than helpful in this situation."

We find no abuse of discretion in the trial court's decision to deny the defendant's motion for mistrial.  *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009).  "Normally, a mistrial should be declared only if there is a manifest necessity for such action."  *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)).  "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did."  *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)).  "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict."  *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Although we certainly do not condone Agent Melton's remark about the defendant's decision to terminate the interview, the remark was fleeting, and the defendant's objection cut the testimony short.  Moreover, the remark was not made in response to any improper questioning by the State, and the State made no attempt to exploit the improper comment.  *See generally Doyle v. Ohio*, 426 U.S. 610, 618 (1976) (declaring prosecution's exploitation of an arrested person's post-*Miranda* silence "fundamentally unfair and a deprivation of due process"); *State v. Transou*, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996).  It would have been entirely appropriate at that

juncture for the trial court to provide a curative instruction, but the defendant specifically and repeatedly rejected the trial court's offer to provide a curative instruction. Under these circumstances, nothing indicated a manifest necessity for the declaration of a mistrial, and the trial court's decision to deny the motion did not result in a miscarriage of justice. *See Saylor*, 117 S.W.3d at 250.

## *V. Trial Court's Commentary*

The defendant claims that the trial court made negative comments during the defendant's testimony that amounted to an improper comment on the evidence, yelled at the defendant in the presence of the jury, and showed "a general disdain for" the defendant during her testimony and that these actions deprived her of the right to a fair trial. She contends that the trial court's actions "essentially prohibited" the defendant "from being able to explain and/or tell her version of the events without specific parameters in her testimony" and that "her direct testimony was essentially shut down by the trial court." The State asserts that the trial court committed no error.

The defendant's direct examination testimony was marked by rambling narratives littered with irrelevant details and inadmissible hearsay. The State made its first objection during a particularly hearsay-heavy tangent about comments made to the victim by some of the program participants about coming to a get-together hosted by the defendant and the victim. The State objected, and the trial court correctly sustained the objection, noting that it was not relevant where all the people were coming from. The State objected again during another such tangent when the defendant inserted her having been diagnosed with colon cancer into her response to the question of what had prompted her to look at the victim's will in August of 2007. Finally, the State objected when the defendant mentioned that she had been charged with the victim's murder only two weeks before she was scheduled to be released from federal custody and that she had "sat in Monroe County jail for 76 weeks" awaiting trial. The trial court took another recess, and the following exchange took place outside the presence of the jury:

> THE COURT: All right. I, I've had enough. I feel like she is intentionally --
>
> COURT OFFICER: Larry, shut the door.
>
> THE COURT: Shut the door. That always happens. Every time they go out, for some reason, they want to hold that thing open.
>
> COURT OFFICER: Yeah, he --

-37-

THE COURT: I have heard her talk about selling eggs to poverty here in Monroe County, people who are rubbing nickels together; I've heard about colon cancer; I've heard about 76 weeks; I've heard about, "Best interest, I'm not really guilty." She is trying to inflame and prejudice this jury. If a State witness did half of the stuff that she's doing, if a State witness did half of what she's doing, you would be moving for a mistrial. And none of that is admissible. It's prejudicial. It is merely designed to inflame the emotional passions of this jury, and we have sustained the objection and sustained and sustained. She has tried to taint this enough; she has. And no more. How much more direct are we gonna have? That's fine, but let it be about substantive issues. She is trying to taint this jury pool. That is this Court's opinion. None of that is admissible, none of it. And I would instruct you, please -- I'm not yelling at you, I'm just yelling. You know, the hearsay -- she's stunned every time I sustain an objection. All that emotional stuff is irrelevant. It doesn't come in. It's inadmissible. And I would ask that during this break you instruct her to focus on the issues. Anything she wanted to do, trust me, it's out there. It is out there. She has -- as she's said, had to say numerous times, "Roman Catholic." It's all out there. I'm gonna take a five-minute recess. You are instructed to stick to the facts. Stick to the facts of this case, Ma'am.

The defendant's claims that the trial court commented on the evidence and yelled at the defendant in the presence of the jury are completely belied by the record. The record clearly establishes that the trial court excused the jury from the courtroom before admonishing the defendant. Although the court officer asked someone to "shut the door," there is no proof that any juror heard the trial court, even if we assume that the door in question was the door to the jury room. Furthermore, the only thing uttered by the trial court before the officer asked for the door to be shut was "[a]ll right. I, I've had enough. I feel like she is intentionally . . . ." We cannot fathom how this comment, even if heard by the jury, can be classified as a comment on the evidence or how it might have prejudiced the defendant.

Additionally, the defendant cites a single case, *State v. Hailey*, in support of her argument. In *Hailey*, however, this court deemed Hailey's claim that the trial court had improperly commented on the evidence to be waived. *State v. Hailey*, 658 S.W.2d

-38-

547, 552-53 (Tenn. Crim. App. 1983). In dicta, we concluded that Hailey had not demonstrated any prejudice because the "trial judge attempted to prevent introduction of the irrelevant information" when making the comment. *Id.* Finally, this court determined that even though "[t]he trial judge erred in making the potentially prejudicial statement" any "error was clearly harmless." *Id.*

The defendant's testimony during direct examination was, as the trial court correctly observed, peppered with irrelevant details and inadmissible hearsay, and the trial court's commentary occurred as it attempted to prevent the introduction of even more irrelevant and inadmissible evidence. The question to be determined by the jury was whether the defendant conspired to and did murder the victim for financial gain. Very little of the defendant's testimony touched upon this issue. Instead, the defendant attempted to provide most of her life story in what, as the trial court noted, appeared to be a bid to garner sympathy from the jury. There was no reason that the jury needed to hear that the defendant had allowed poor persons to buy discounted eggs from her, that she had been previously diagnosed with cancer, or that she had been incarcerated for an extended period of time prior to trial. The defendant complains about the "parameters" affixed to her testimony by the trial court, but the record establishes that the only parameters imposed by the trial court were those required by the rules of evidence. The defendant is not entitled to relief on this issue.

## VI. Sufficiency

The defendant next asserts that the evidence was insufficient to support her convictions because it consisted solely of the uncorroborated testimony of Mr. Kaczmarczyk. The State avers that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must

afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant was originally charged with first degree premeditated murder, which, as charged in this case is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a). She was convicted, however, of the lesser included offense of attempted first degree murder. Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2).

The defendant was also charged with and convicted of conspiracy to commit first degree murder.

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

T.C.A. § 39-12-103(a).

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696-97 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). Indeed, "[w]hen the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is

sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004) (citing *Ripley v. State*, 227 S.W.2d 26, 29 (1950); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the trier of fact. *Robinson*, 146 S.W.3d at 489 (citing *Perkinson*, 867 S.W.2d at 7); *see also Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." *Robinson*, 146 S.W.3d at 489 (citing *Monts*, 379 S.W.2d at 43).

To be sure, Mr. Kaczmarczyk was an accomplice to both charged offenses. That being said, his testimony was sufficiently corroborated by other evidence in the record.

Mr. Kaczmarczyk's testimony that the previously active and energetic victim became "very lethargic" following his return from the PTSD treatment program was corroborated by Ms. Hartman, who testified that the victim stopped visiting the Hartman residence with the defendant and that the defendant brought Mr. Kaczmarczyk with her in his stead. Ms. Hartman's testimony also bolstered Mr. Kaczmarczyk's testimony that he and the defendant began a romantic relationship in April of 2006. Both Mr. Kaczmarczyk and Ms. Hartman testified that the defendant had cut and dyed her hair around that same time, and both testified that the defendant had remarked that the new style had upset the victim. Mr. Kaczmarczyk testified that the defendant "mentioned on several occasions that she would like to get rid of" the victim and that "if he went away," she and Mr. Kaczmarczyk "could be together."

Mr. Kaczmarczyk testified that he suspected that the defendant, who was in charge of the victim's medications at that time as she had been "everyday since he had

-41-

been released from Nashville," had been adulterating the victim's "food and medications." On two occasions, the defendant and Mr. Kaczmarczyk suspected that the victim had overdosed, but instead of taking the victim to the nearest emergency room, they drove the victim to the VA hospital nearly three hours away, which was corroborated by the victim's medical records. At a "family meeting" at the VA hospital following the victim's hospitalization for an overdose, the defendant told the victim's treatment team that she would be in charge of the victim's medication and ensure that he took it as prescribed. The victim's medical records confirmed that the defendant said that she had been administering the victim's medication following his hospitalization.

Mr. Kaczmarczyk testified that the defendant asked him to bring some of his medications, which were the same as those prescribed to the victim, so that they could hide them around the house to make it look like the victim had been hoarding medication. After the victim's death, Mr. Kaczmarczyk and the defendant arranged to have Brian McGavic discover one such stash of drugs in a safe in the garage. Brian McGavic confirmed that he felt as though the defendant and Mr. Kaczmarczyk had manipulated him into discovering the drugs. Pharmacy records confirmed that both the victim and Mr. Kaczmarczyk filled multiple prescriptions for Trazodone and Mirtazapine in the months between their release from the PTSD treatment program and the victim's death.

Mr. Kaczmarczyk testified that on May 13, 2006, the day that Mr. Kaczmarczyk brought the victim home from the hospital, the defendant "had fixed [the victim's] favorite meal," but the victim "complained that it didn't taste very well," so the defendant "put seasoning on it so that he would eat it." Later, the defendant remarked to Mr. Kaczmarczyk "that she had used magic dust on it," which Mr. Kaczmarczyk interpreted to mean that she had put medication in the victim's food. Doctor Mileusnic-Polchan confirmed that the victim "died of [a] combination of the Trazodone and Mirtazapine, which is the main cause of death." She said that the victim had "almost four times the maximum therapeutic" amount of Trazodone and seven and a half times the maximum therapeutic amount of Mirtazapine in his system at the time of his death. Despite the high concentration of both drugs in the victim's blood, the victim had no gastric contents, which indicated that he had not eaten within a "minimum of six hours," and there were no pill fragments in the victim's stomach, which indicated to Doctor Mileusnic-Polchan that the victim had not ingested the medication as whole or half tablets. She observed that crushing the tablets in this case would have defeated the controlled-release mechanism and caused an increase in the concentration of each drug in the victim's system. Doctor Mileusnic-Polchan testified that the absence of "granular substance in the gastric content" as well as "a lot of fluids to help all those drugs push down" militated against a conclusion that the victim's death was a suicide. She also testified that in typical cases of suicide by overdose, "we have much larger levels [of

drugs] because when there is intent and there is an oral intake of the drugs, that elicits sudden surge of these medications in the blood stream, then the layers are much higher."

Mr. Kaczmarczyk testified that on the day before the victim's death, the defendant told him that if he found the victim dead, he should "keep it simple," which Mr. Kaczmarczyk took to mean that he should "make it look as natural as possible or make it look like a suicide." To that end, when Mr. Kaczmarczyk returned to the Coker Creek residence on the afternoon of May 15, 2006, to find the victim in serious medical distress, he did not telephone 9-1-1 but moved the victim to the recliner. When the victim died shortly thereafter, Mr. Kaczmarczyk did not immediately call for help but instead staged the scene in a manner designed to increase the defendant's potential benefits from the VA. Other witnesses confirmed that the victim received more benefits because the victim's death was deemed a suicide due to his service-related PTSD. Ms. Hartman confirmed that the defendant's lifestyle improved dramatically after the victim's death. The defendant purchased expensive diamond earrings, a large motor coach, and many matching outfits for herself and Mr. Kaczmarczyk, and the two of them began traveling extensively. The victim also gave Mr. Kaczmarczyk $50,000 to hire a lawyer after he was charged with offenses related to the victim's death. The defendant forged the victim's will to further increase her financial gain from the victim's death.

The defendant lied to Mr. McGavic about the cause of the victim's death. Then, after Mr. McGavic discovered the staged photographs taken of the dead victim, the defendant did not express concern or outrage about the origin of the photographs but instead instructed Mr. McGavic to have the photographs removed from the computers so that they would not be discovered by the authorities.

In sum, it is our view that the evidence presented by the State was more than sufficient to support the defendant's convictions of attempted first degree murder and conspiracy to commit first degree murder.

*VII. Sentencing*

The defendant contends that the trial court erred by imposing the maximum sentence within the range for both of her convictions and by ordering the sentences to be served consecutively. She also argues that the trial court should have merged her convictions because the imposition of dual convictions violates both due process and double jeopardy principles. The State concedes that the imposition of dual convictions and consecutive sentences in this case was improper because Code section 39-12-106 prohibits the conviction of more than one inchoate offense for conduct that culminates in the commission of a single offense.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)).

Initially, we accept the State's concession that the defendant's convictions must be merged. Although she was originally charged with first degree murder, the defendant was actually convicted of attempted first degree murder. Tennessee Code Annotated section 39-12-106 provides that "[a] person may not be convicted of more than one (1) of the offenses of criminal attempt, solicitation or conspiracy for conduct designed to commit or to culminate in the commission of the same offense." T.C.A. § 39-12-106(a). This subsection "bars multiple convictions for more than one preparatory offense where each is designed to achieve the same criminal objective." *Id.*, Advisory Comm'n Comments. The statute thus prohibits imposition of convictions for both attempted first degree murder and conspiracy to commit first degree murder in this case and certainly prohibits the imposition of consecutive sentences. Instead, the jury verdicts should be merged into a single conviction, and the judgment forms should indicate as much. Consequently, we reverse the imposition of consecutive sentences and remand the case for the entry of corrected judgment forms indicating that the defendant's convictions merge.

Turning to the defendant's claim that the trial court erred by imposing a sentence at the top of the range, we observe that although the defendant states the issue presented as "[w]hether or not the trial court erred by ordering consecutive maximum sentences," she does not challenge the trial court's findings with regard to the enhancement and mitigating factors. Indeed, the only portion of her argument that could be said to relate to the imposition of the maximum sentence in this case is a reference to the sentence imposed for Mr. Kaczmarczyk's guilty-pleaded conviction of conspiracy to commit first degree murder. The record reflects "a proper application of the purposes and principles of our Sentencing Act" as well as appropriate consideration of the enhancement and mitigating factors, *see Bise*, 380 S.W.3d at 707, which imbues the within-range sentence with a presumption of reasonableness. Nothing indicates that the trial court abused its discretion when setting the length of the sentence.

*VIII. Conclusion*

Based upon the foregoing analysis, we affirm the jury verdicts of attempted first degree murder and conspiracy to commit first degree murder. Because Code section 39-12-106 prohibits dual convictions for attempt and conspiracy to commit the same offense, the defendant's convictions must be merged. Accordingly, we reverse the imposition of consecutive sentences and remand the case to the trial court for the entry corrected judgments reflecting the merged convictions.

_____
JAMES CURWOOD WITT, JR., JUDGE